IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:21-CR-869 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| CHELSEA PERKINS, | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

Now comes the United States of America, by and through its attorneys, David M.

Toepfer, United States Attorney, and Scott Zarzycki, Margaret Kane, and Adam Joines, Assistant

United States Attorneys, and hereby file this sentencing memorandum.  The government

respectfully requests that this Court sentence the defendant, Chelsea Perkins, to 300 months (25

years) imprisonment.  (R. 18: Plea Agreement, PageID 84).  Perkins executed Matthew Dunmire

after disparaging him to her friends.  She carried a gun, drove across three states, and left his

body to "forest scavengers."  Afterward she pretended nothing happened, feigned ignorance to

friends and law enforcement, and wrote a fake suicide note to cover her tracks.  Her callous

actions before, during, and after her decision to murder Dunmire demand a sentence of 300

months.  A sentence at this high end of the plea agreements' sentencing range is sufficient, but

not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a).

## I.  BACKGROUND

### A.  PROCEDURAL HISTORY

On March 6, 2021, Chelsea Perkins shot Matthew Dunmire in the back of the head in a

secluded area of the Cuyahoga Valley National Park.  On December 8, 2021, the government

charged Perkins in a criminal complaint with Murder in violation of 18 U.S.C. § 1111(a).  On

December 9, 2021, Perkins was arrested in Pensacola, Florida.  On December 16, 2021, a

Federal Grand Jury returned an indictment charging Perkins with Murder in the First Degree, in violation of 18 U.S.C. §§ 7(3) and 1111(a) and (b); Murder in the Second Degree, in violation of 18 U.S.C. §§ 7(3) and 1111(a) and (b); and Using or Carrying and Discharging a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii).  (R. 207: Presentence Investigation Report (sealed) (hereinafter, "PSR"), PageID 1667).  On January 24, 2022, Perkins was arraigned in the Northern District of Ohio.  On February 28, 2022, Perkins was ordered detained.

On May 27, 2025, Perkins pled guilty to Counts 2 and 3 of the Indictment, pursuant to a Rule 11(c)(1)(A) and (C) plea agreement.  (*Id.*).  The parties agreed to recommend a specific sentence within the range of 240 to 300 months imprisonment (20–25 years).  (*Id.*).  The parties agreed that if the Court accepts the plea, it must sentence Perkins within this range.  (*Id.*); *see also* Fed. R. Crim. P. 11(c)(1)(C).

B.      OFFENSE CONDUCT

On March 6, 2021, Chelsea Perkins, motivated by anger, revenge, and resentment, purposely and maliciously killed Mathew Dunmire.  She entered a secluded area of the Cuyahoga Valley National Park, walked with Dunmire off-path, carried a gun she brought with her from Virginia, and when the time was right, shot him at the base of his skull.  After the murder, Ms. Perkins made efforts to cover up her crime and any connection she had to Dunmire, then callously moved on with her life as if nothing happened.

1.      Perkins' Mindset Before the Murder

Prior to the murder, Perkins made her feelings known about Dumire in a Facebook communication with a friend.  In the message, both Perkins and her friend discussed seeing notifications from Facebook suggesting Dunmire as a friend.  They disparaged him.  Ms. Perkins made comments like "Idk how people still fuq with him," and "[h]e's really just that fuct."

2

(Exhibit 1: FB message with metalgarysolid).  Ms. Perkins then wrote that Dunmire will "get his someday."  (*Id.*).  Her friend's response: "Karma is an evil bitch."  (*Id.*).

Five days later on March 2, 2021, Dunmire received an email notification that his Facebook account received a message from Facebook account "Chelperk" using Facebook name "Chelsea Savage" (Chelsea Perkins' Facebook Account).  (Ex. 2: Gmail notification Dunmire's email).  On March 3, 2021, she accepted Dunmire's friend request. (Ex. 3: FB notification accepting Dunmire).  The same day, Perkins posted on her Facebook account: "Dead men tell no tales."  (Ex. 4: FB post "dead men tell no tales).  Between March 3, 2021, and March 5, 2021, Dunmire received multiple email notifications that his Facebook account received messages from Perkins.[1]  (Ex. 5: Gmail notifications of FB messages).  During the same period, Dumire subscribed to Perkins' Only Fans account, where he paid money to view her pornographic content.  He also visited websites such as Pornhub.com to see additional content where Perkins used the name "Selena Savage."  (R. 207: PSR, PageID 1669).

On Thursday, March 4, 2021, Perkins began making arrangements to get a tattoo from an acquaintance in the adult entertainment industry in Waterford, Michigan (near Detroit).  In a Facebook message on March 4, 2021, at approximately 11:52 p.m.,[2] Perkins suggested a specific tattoo, describing it as "Pretty simple but picture a little rope noose traditional style?  With the text 'tighten up' next to it.  That'd be soooo sick."  (Ex. 6: FB communications with A.S.).

---

[1] Despite several notifications to Dunmire's email that he received Facebook messages from Perkins, a review of his Facebook records reveals no content of any messages between them.

[2] Facebook records time in UTC is 4:52 a.m. on March 5, which translates to 11:52 p.m., EST, on March 4.  Eastern Standard Time was 5 hours behind UTC in March 2021.

3

2.  <u>Perkins Travels to Cleveland with Her Gun to Meet Dunmire</u>

On March 5, 2021, at approximately 11:50 a.m., Chelsea Perkins left her home, husband, and two children, in Arlington, Virginia, to head west toward Dunmire in Cleveland, Ohio.  After work that same day, Dunmire met coworkers at a bar called the Tiki Underground.  (R. 207: PSR, PageID 1669). He told one of his coworkers that a woman was coming to pick him up and that she wanted to go to a graveyard in the woods to make "Only Fans content" for some amateur pornography.  (*Id.*).

Dunmire's statements to coworkers are consistent with Perkins' social media, which has multiple references showing her interest in graveyards and creating pornographic content within them.  On January 24, 2021, Perkins wrote in a Facebook message: "I like the cemetery at the end of the street where Banks St. Bar is.  Once I snuck into St. Louis Cemetery at night climbing up the wall but that's prob super illegal."  (Ex. 7: FB chat sneaking into cemetery).  On February 4, 2021, Perkins wrote in another comment that she wanted to "do a NSFW shoot at the Arlington Cemetery."[3]  (Ex. 8: Arlington cemetery chat).  In an Instagram chat on March 24, 2021, Perkins commented that "the graveyard video we made was siiiq."  (Ex. 9: Chat graveyard video we made).  In a recorded Facebook post on August 29, 2021, Perkins talked about how she urinated on a "dude in the graveyard after having sold him a bunch of… medicine [laughs]." (Ex. 10 and 10A: FB record of audio-clip with date).  The same day, in a Facebook messenger comment, Perkins discussed filming a scene urinating on someone in a cemetery.  (Ex. 24: FB message about scene in cemetery).

---

[3] NSFW (Not safe for work) is internet slang or shorthand used to mark links to content, videos or website pages the viewer may not wish to be seen viewing in a public formal or controlled environment.  The marked content may contain graphic violence, pornography, profanity, nudity, slurs or other potentially disturbing subject matter. https://en.wikipedia.org/wiki/Not_safe_for_work

On March 5 at approximately 6:07 p.m., Perkins picked Dunmire up at the Tiki Underground, and the two headed toward an Airbnb that Perkins reserved near University Circle in Cleveland.  (R. 207: PSR, PageID 1669).  Between 6:58 p.m. to 8:03 p.m., Dunmire's Gmail account and cell phone location data registered his location near the Airbnb, where the two spent the night together in the same bed.  While at the Airbnb, Perkins texted her Michigan tattoo artist that checkout at the Airbnb was at 10 a.m., and that she was going to "check out a spot" before she left but would be able to meet her at around 2 or 3 pm depending on traffic.  (Ex. 6: FB messages with A.S.).  Also, while in the Airbnb with Dunmire, Perkins posed for several photos of herself without clothing, which she later posted on her Only Fans account and Twitter.

### 3.  Perkins Shoots Dunmire and Leaves Cleveland

On March 6, 2021, at 9:23 a.m., Dunmire and Perkins left the Airbnb and drove south towards the Cuyahoga Valley National Park.  (Ex. 11: CAST report, page 14).  At approximately 9:42 a.m., they arrived at the Terra Vista Study area of the park.  (*Id.*).  Perkins and Dunmire entered the woods and began hiking toward the Terra Vista Cemetery.  They hiked off the established path and across rough terrain into gullies and up hills until they reached an area near a log deeper in the woods.  While in this secluded spot, between approximately 11:30 and 11:50 a.m.,[4] Perkins held a 9mm caliber pistol to the back of Dunmire's head.  She fired one time, killing him.  Perkins then hiked back to the path and toward her vehicle but initially traveled the wrong direction.  She encountered two hikers who directed her toward the area of the cemetery before she parted ways with them to walk back toward her car.  (R. 207: PSR, PageID 1670).  One hiker described Perkins as pulling "her hoodie forward covering her cheeks," despite it being a nice day, and speaking in a voice that was "soft and childlike without much modulation."

---

[4] Two hikers reported hearing a gunshot between 11:30 a.m. and 11:50 a.m.  (R. 207: PSR, PageID 1670).

(Ex. 28: Statement to Valley View Police Dept. by L.D.).  She also lied to the hikers, saying she was from St. Louis in a "monotone voice with no expression."  (Ex. 29: Statement to Valley View Police Dept. by R.D.).  Perkins said nothing to the hikers about Dunmire.  Instead, she claimed she was in the park alone (*see id.*), despite having left Dunmire's now-dead body in the woods minutes before.

Shortly after leaving the hikers, Perkins began covering up her crime via social media. At approximately 12:10 p.m., Perkins sent a Facebook message to her tattoo artist that she was "a bit behind n having a slow start to the day but I'm grabbing a meal n coming up."  (Ex. 6: FB message with A.S., pg. 4).  At 12:36 p.m., Perkins sent another message saying "It'll prob be more like 4pm if that's ok!"  (*Id.*, pg. 5).  At 12:46 p.m., Perkins removed Dunmire as a "friend" on her Facebook account "Chelperk."[5]  (Ex. 12: Perkins removes Dunmire).  At 12:55 p.m., Perkins changed her own Facebook password.  At 12:57 p.m., Perkins deactivated her Facebook account entirely.  (R. 207: PSR, PageID 1669); *see also* (Ex. 13: FB deactivation record).  At 12:59 p.m., the E-ZPass transponder in Perkins' vehicle activated at the North Ridgeville, Ohio turnpike entrance.  (Ex. 14: CAST report, pg. 16).  At 2:13 p.m., it activated at the exit of the turnpike at Stony Ridge, Toledo, then Perkins travelled north into the State of Michigan.  (Ex. 15: Cast report pg. 17).

Before Perkins left the park and in the midst of her social media blitz, however, she took Dunmire's phone with her.  At approximately 12:24 and 12:29 p.m., Dunmire's phone pinged off a cell tower facing away from the location of his body, which at the time still lay where Perkins shot him in the park.  (Ex. 14: CAST report pg. 16).  Instead, the tower pointed toward Perkins' path of travel via Rockside Road to the North Ridgeville, Ohio turnpike entrance.  (*Id.*).  The

---

[5] Perkins' Facebook account "chelperk" has a target number 100013649852047

phone ping at this time, coupled with his phone never being found, show that Perkins took it after shooting him.  Later when investigators reviewed Dunmire's Facebook records, they found no record of messages between him and Perkins, despite Dunmire's email showing that messages were exchanged.

That same day, just hours after she murdered Mathew Dunmire, Perkins finally arrived at her destination in Michigan to get her "noose" tattoo.  (R. 207: PSR, PageID 1669).  When the procedure was complete, Perkins was so excited, she texted her husband a picture of herself appearing to be choking her tattoo artist while displaying the tattoo.  Along with the picture, she wrote to her husband "I had the best day!"  (Ex. 16: Perkins text to husband).  She later posted the same picture on her public Instagram account at 2:43 am the following day with the caption "What a great weekend!!" (highlighted in red, below):



Perkins' cell phone extraction revealed that at approximately 8:26 p.m. on March 6, 2021,

Perkins searched Google for "forest scavengers."[6]  (Ex. 17: Cell phone record of Google search).

Perkins then travelled back east to her family in Arlington, Virginia.  Her E-ZPass

records indicated that she travelled back home through Ohio and Pennsylvania in the early

morning hours of March 7, 2021.

---

[6] A Google search of "forest scavengers" results in the definition "…animals that feed on the bodies of dead animals and other organic matter in a forest ecosystem…."

4.         <u>Hikers Stumble Upon Dunmire's Body</u>

On Tuesday, March 9, 2021, at approximately 11:00 a.m., a group of hikers discovered the deceased body of Matthew John Dunmire in the woods near the "Terra Vista Cemetery" in the Cuyahoga Valley National Park. (R. 207: PSR, PageID 1667). Dunmire was identified by his identification card inside his pocket. (*Id.*). A plastic Aquafina water bottle was found next to Dunmire's body. (*Id.*). The cause of death was a single gunshot wound to the back of his head. (*Id.*, PageID 1668). Later investigation revealed the presence of Perkins' DNA on the water bottle, under Dunmire's fingernails, and on his pubic hair. (*Id.*).

In the days and weeks after she murdered Dunmire, Perkins continued to deflect attention away from herself and conceal her crime. The same day Dunmire's body was discovered and shortly after news on social media reported that he was dead, Perkins created a note on her cell phone that appeared to be a suicide note on behalf of Dunmire. It stated, "if you're reading this, it's to late. I'm sorry I beat you, and I raped a couple of chicks years ago. I'm a shitty person and paid for my sins with blood. I've decided to leave this cruel world. Sorry I didn't warn you first." (R. 205: PSR, PageID 1644); *see* (Ex. 18: cell phone record of deleted note). She then deleted that note. On March 10, 2021, a friend texted Perkins that he or she "just found out Matt died." Perkins feigned surprise, responding "Whaaaaat?" (Ex. 19: text about Dunmire's death). On March 12, 2021, in an Instagram message, Perkins discussed her intention to clean and/or get rid of her car. She stated, "I need to buy some cleaner to prep my car for a trade in." (Ex. 20: IG message about cleaners to prep car for trade-in).

On March 30, 2021, a search warrant was executed at Perkins' residence. Perkins briefly spoke to federal agents, where she denied having any involvement or knowledge about what happened to Matthew Dunmire other than saying a friend told her that he died and that he killed

9

himself. (R. 205: PSR, PageID 1643). Perkins then suggested to agents that they should talk to his "crazy ex-girlfriend." (*Id.*).

On December 9, 2021, Perkins was arrested for the murder of Matthew Dunmire. While in custody, Perkins made a number of phone calls from the Santa Rosa County Sheriff's Office, where she continued to adamantly deny, even to those closest to her, that she had anything to do with Dunmire's murder. She claimed the government had no case, that she had nothing to hide, that she felt like she was being "framed," and that she heard people get killed in the woods and that someone had it out for him [Dunmire]. (Ex. 21: recorded call "getting framed"). In another call she asked that someone "go through the f**king Twitter account, lock it up." (Ex. 22: recorded call "lock it up"). In another call, Perkins stated that "they're just grabbing at f**king straws and trying to pin some s**t on someone with this he said she said bulls**t and that's why things are the way they are." (Ex. 23: recorded call "grabbing at straws").

C.    GUIDELINE CALCULATION

The following is the Guideline Computation contained in paragraphs 27–37 of the Presentence report. (R. 207: PSR, PageID 1674). The Guideline Computation in the plea agreement is consistent with the presentence report. (*Id,* PageID 1667).

| U.S.S.G. § 2A1.2 Murder | | |
|---|---|---|
| Base offense level | 38 | § 2A1.2(a) |
| **Subtotal** | **38** | |

| U.S.S.G. § 2K2.4: Using or Carrying, and Brandishing a Firearm During and in Relation to a Crime of Violence | |
|---|---|
| The guideline sentence is the minimum term of 120 months imprisonment required by statute. | §2K2.4(b) |

With a criminal history category I and offense level 35 after acceptance of responsibility, the guideline range would be 168–210 months. The term of imprisonment would run consecutive to 120 months for Count 3, which combined with the prior guideline range would equal 288–330

months.  The parties have agreed the appropriate disposition in this case is for Perkins to receive

a sentence in the range of 240 to 300 months.  (*Id.*, PageID 1684).

     D.    <u>PERKINS' MENTAL HEALTH</u>





12



E.    SENTENCING FACTORS 18 U.S.C. § 3553(A)

Upon properly calculating the advisory guideline range, this Court is required to follow

18 U.S.C. § 3553 (a), which states:

> This Court is required to consider the following factors in
> determining the sentence.
>
> (a) Factors to be considered in imposing a sentence.--The court
> shall impose a sentence sufficient, but not greater than necessary,
> to comply with the purposes set forth in paragraph (2) of this
> subsection. The court, in determining the particular sentence to be
> imposed, shall consider--
>
> (1) the nature and circumstances of the offense and the history and
> characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>
> (A) to reflect the seriousness of the offense, to promote respect for
> the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational
> training, medical care, or other correctional treatment in the most
> effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for--
>
> (5) any pertinent policy statement--
>
>  (6) the need to avoid unwarranted sentence disparities among
> defendants with similar records who have been found guilty of
> similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

14

18 U.S.C. § 3553(a).

The Government requests that this Court impose a sentence at the high end of the agreed-upon range because a sentence of 300 months is sufficient, but not greater than necessary, to account for the seriousness of Perkins' actions and the nature and circumstances of that offense, to promote respect for the law, and to provide just punishment for the offense.  Additionally, Perkins' guideline sentence for Count 2, combined with the mandatory term of 120 months imprisonment for Count 3 would equal 288–330 months.  A sentence of 300 months is reasonable and near the low end of that range.

The facts of this case show that Chelsea Perkins committed a purposeful and calculated murder, which she attempted to cover up by deflecting attention away from herself and obscuring her connections to Dunmire.  This murder was motivated by a deep resentment and anger toward the victim Matthew Dumire, who Perkins claimed raped her in 2017 but that was declined for prosecution due to insufficient evidence.  Then 4 years later, on March 6, 2021, Perkins took her revenge by executing him with a bullet to the back of his head in a remote area of the Cuyahoga Valley National Park.  Ms. Perkins' regular use of social media reveals her feelings toward Matthew Dunmire.  Her specific words, "he'll get his someday," became reality when Perkins drove across three states with a gun to exact her revenge.  Perkins' underlying motivations are even more evident in the forensic psychological evaluation of Dr. Scott Bender. In his interview with Perkins, she described a great deal of "resentment and indignation toward Dunmire, primarily because he would not admit he raped her."  (Ex. 26: Dr. Bender's report). He noted that rather than describing the trauma she experienced related to the event, Perkins' anger stemmed from his refusal to go along with her demands and admit a rape occurred.  Her decision was not made in the heat of the moment but occurred after a buildup of negative feelings that she acted upon with violence.

Once she committed the offense, Perkins callously began her efforts to cover up her crime and move on with her life.  Almost immediately after the murder, she texted her tattoo artist that she was running late, was going to grab a meal and would be on her way.  Perkins encountered an older couple walking their dog in the woods immediately after she killed Dunmire.  Perkins mentioned nothing about just being assaulted in the woods by Dunmire, did not ask for help or that they call 911, and instead appeared calm.  Perkins removed Dunmire as a "friend" on her Facebook account, changed her own Facebook password, then decided to deactivate her Facebook account entirely.  Matthew Dunmire's cellular phone records and an interview with his girlfriend A.W. indicated his last text was sometime between 10:00 and 11:00 a.m. on March 6, 2021.  (R. 207: PSR, PageID 1669).  Dunmire's cell phone was never recovered.  It was not found on his body, or anywhere near the crime scene.  Despite notifications to Dunmire's Gmail account that he was receiving messages from Perkins on Facebook, all of the content of those messages were missing from Dunmire's Facebook records.

Once Perkins made her way to Michigan to get her tattoo, she took the time to research the meaning of "forest scavengers" on Google.  After the tattoo was complete, she texted her husband about what a great day she had, sending along picture of her new tattoo while appearing to choke her tattoo artist.   Later, Perkins posted the same picture to her Instagram account, telling all her connections on the social media platform about what a "great weekend" she had. In doing so, Perkins was attempting to create the perception that she simply spent the weekend travelling to Michigan getting a tattoo from a friend.  According to Dr. Bender, Perkins was able to recall what happened before, during and after the offense and provided coherent descriptions of her thoughts and actions.

On March 9, 2021, coincidentally the day Dunmire's body was discovered, Perkins drafted a note in her cell phone which she later deleted.  The note appeared to be an apparent

16

suicide note on behalf of Dumire.  On March 10, 2021, a friend texted Perkins that Dunmire died, and Perkins feigned complete surprise.  On March 12, 2021, Perkins discussed on social media her intention to clean and get rid of her car.

On March 30, 2021, when law enforcement interviewed Perkins, she denied having any knowledge of Dunmire's death.  Instead, she misled law enforcement with rumors about Dunmire committing suicide and suggesting that they question his "crazy ex-girlfriend."  After Perkins was arrested for this offense, she lied to law enforcement again, and in recorded calls lied to her husband and those closest to her about Dunmire's murder.  She claimed repeatedly that the government had no case, that the government was grasping at straws, and that she was being framed.  She even told someone to lock up her Twitter account.

Perkins actions before, during, and after the homicide of Matthew Dunmire show her purposeful intent to cause his death.  The callous way in which she attempted to erase all connection to her and Dunmire after the offense and attempts to deflect attention away from herself as she went on with her life and her family reflect a serious lack of remorse for this offense.  There are few more serious offenses a person can commit than a cold execution style murder of another person by shooting him in the back of the head and then discarding the body in the woods.  The impact of Perkins' conduct reverberated to others, causing devastation to his family and the near death of another innocent person.  A sentence of 300 months imprisonment is necessary to reflect the serious nature of this offense and provide just punishment for this heinous offense.

## F.       VICTIM REPRESENTATIVES

A crime victim has the right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.  18 U.S.C. § 3771(a)(4); *see also* Fed. R. Crim. P. 60(a)(3).  In cases where the court finds that the number of

17

crime victims makes it impracticable to afford all of the crime victims these rights, the court shall fashion a reasonable procedure to provide victims the rights they are entitled to by law while not unduly complicating or prolonging the proceedings. *Id.*

In the present case the Government expects that two representatives of the victim will be present and wish to address the Court at sentencing. One of these individuals is the deceased victim's father, and another is the deceased victim's uncle. The Government notified the Court of this information approximately two weeks prior to the sentencing. The Court instructed the Government that each victim representative would be limited to speaking for three minutes at the sentencing hearing.

The Government respectfully asserts that these victims have the right to be reasonably heard at the sentencing for the Defendant who murdered their loved one. While the Government does not expect these individuals to speak for an extended period, they may wish to speak for more than three minutes. The Government respectfully requests that this Court reconsider the three-minute limit imposed on the victims given the serious nature of the case and that these family members lost a loved one. There are not a large number of victims and affording these two individuals a right to speak for a reasonable amount of time will not delay the proceedings. The Government will ensure that it instructs the victim representatives to be mindful of the Court's schedule and will not unduly complicate or prolong the process. This will ensure that the victim's representatives are afforded the rights they are entitled to by statute.

## II. THE COURT MUST ORDER RESTITUTION TO THE VICTIMS FOR THE FULL MEASURE OF LOSS

On behalf of the victims, specifically Matthew Dunmire's estate and family members, the government requests that the Court order restitution in the amounts described below.

A.      RESTITUTION IS MANDATORY UNDER 18 U.S.C. § 3663A

Restitution orders are authorized by statute (18 U.S.C. §§ 3663A, 3664) and are distinct and separate from the United States Sentencing Guidelines.  "Although the guidelines mandate imposition of restitution where allowable under the statutes, the restitution statutes function independently from the guidelines and do not rely on the guidelines for their validity."  *United States v. Sosebee*, 419 F.3d 451, 462 (6th Cir. 2005).

Restitution is punishment.  *United States v. Schulte*, 264 F.3d 656 (6th Cir. 2001); *see also United States v. Bearden*, 274 F.3d 1031, 1041 (6th Cir. 2001) (restitution is "punitive rather than compensatory in nature").  Restitution "is a criminal penalty and a component of the defendant's sentence."  *United States v. Adams*, 363 F.3d 363 (5th Cir. 2004) (quoting *United States v. Chaney*, 964 F.2d 437, 451 (5th Cir. 1992)).

Restitution is mandatory when the offense, like in this case, is a crime of violence or one "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss."  18 U.S.C. §§ 3663A(c)(1)(A)(i) and (c)(1)(B); *see also* 18 U.S.C. § 3663A(a).  Courts must order restitution to victims, or to a victim's estate or another family member or other person designated by the Court if deceased, for the full amount of their losses.  18 U.S.C. §§ 3663A(a) and 3664(f)(1)(A).  The amount of restitution should be equal to the "amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the Defendant."  18 U.S.C. § 3664(f)(1)(A); *see also Sosebee*, 419 F.3d at 462 (emphasizing that the court determines the relevant facts for a restitution order).

The court must make a finding as to loss amount by a preponderance of the evidence using a reasonable estimate predicated on the facts of the case.  *United States v. Blackwell*, 459 F.3d 739, 772 (6th Cir. 2006) (citing *United States v. Davidson*, 409 F.3d 304, 310 (6th Cir. 2005)).  The court "need only make a reasonable estimate" of the amount of loss.  *United States*

*v. Jones*, 641 F.3d 706, 712 (6th Cir. 2011) (citing U.S.S.G. § 2B1.1 cmt. N. 3(C)). Specific findings are not required; instead, the court may rely on information with a "sufficient indicia of reliability to support" the "probably accuracy" of the amount of restitution. *United States v. Jackson-Randolph*, 282 F.3d 369, 386 (6th Cir. 2002) (internal quotations omitted). It is appropriate to extrapolate restitution losses in those cases where "'a precise calculation of the loss is simply not feasible.'" *United States v. Carmichael*, 676 F. App'x 402, 406 (6th Cir. 2017) (quoting *United States v. Tipton*, 269 F. App'x 551, 561 (6th Cir. 2008)).

B.      THE VICTIMS HERE INCLUDE THE DECEASED VICTIM AND HIS
        AFFECTED FAMILY MEMBERS

18 U.S.C. § 3663A defines a "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered," and includes, in the case of a deceased victim, the "representative of the victim's estate." 18 U.S.C. § 3663A(a)(2). Here, the victims are the estate of deceased victim M.D. and his family member[s] who have suffered financial losses that are covered under the MVRA, as set forth below.

The MVRA requires a district court to order a defendant to make restitution to a victim of a crime of violence who has suffered a bodily injury or pecuniary loss as a result of that crime. *See* 18 U.S.C. § 3663A(a)(1) and (c)(1); *United States v. Eyraud*, 809 F.3d 462, 467 (9th Cir. 2015); *United States v. Flucas*, No. 2:17-cv-00209-KJM, 2019 WL 6250710, at *2 (E.D. Cal. Nov. 21, 2019). The definition of "victim" in the context of the MVRA is broad and includes "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered[.]" 18 U.S.C. § 3663A(a)(2); *see also United States v. Sharma*, 703 F.3d 318, 323 (5th Cir. 2012) (finding that under the MVRA, sentencing courts must order restitution for a victim's "actual loss directly and proximately caused by the defendant's offense of conviction").

20

Additionally, because the MVRA defines "victim" broadly, family members may also be considered victims in their own right where they suffered pecuniary losses as a result of the defendant's criminal conduct.  *See* 18 U.S.C. § 3664(j)(1); *United States v. Price*, 906 F.3d 685, 689 (7th Cir. 2018) (finding that the family members were victims in their own right when they had to pay funeral expenses as a result of the murder); *United States v. Douglas*, 525 F.3d 225, 254 (2d Cir. 2008) (recognizing that a father would be entitled to funeral-related expenses incurred in the burial of his adult son).

The "[d]efendant's conduct need not be the sole cause of the loss," but it cannot be "too attenuated (either factually or temporally)." *United States v. Collins*, 854 F.3d 1324, 1336 (11th Cir. 2017) (citing *United States v. Robertson*, 493 F.3d 1322, 1334 (11th Cir. 2007)). A person is "proximately harmed" when the harm is "a reasonably foreseeable consequence of the criminal conduct." *United States v. Schenck*, No. 20-19, 2023 WL 3019959, at *6 (E.D. La. April 20, 2023) (citing *United States v. Munn*, 837 F. App'x 293, 296 (5th Cir. 2020)); *United States v. Collins*, 854 F.3d 1324, 1336 (11th Cir. 2017); *see also United States v. Washington*, 434 F.3d 1265, 1266 (11th Cir. 2006) (upholding an order of restitution where police vehicles were damaged as a result of the defendant fleeing after robbing a bank because flight was a natural component of the bank robbery and the defendant could have foreseen that any ensuing high-speed chase would result in property damage).

In *In re McNulty*, 597 F.3d 344, 351 (6th Cir. 2010), the Sixth Circuit reasoned that under the plain language of 18 U.S.C. § 3771 (Crime Victim's Rights Act) a person may qualify as a victim even though she may not have been the target of the crime, as long as she suffers harm as a result of the crime's commission. *Id*. at 351.  In making this determination, a sentencing court must (1) first look at the offense of conviction, based solely on the facts reflected in the jury verdict or admitted by the defendant; and then (2) determine, based on those facts, whether any

21

person or persons were "directly and proximately harmed as a result of the commission of that federal offense." *Id.* (internal quotation marks and citation omitted). The requirement that a victim be directly and proximately harmed encompasses the traditional "but for" and proximate cause analyses. *Id.* at 350.

"But-for" causation is "not a difficult burden to meet," and there can be many but-for causes. *Schenck*, 2023 WL 3019959, at *6 (citing *Munn*, 837 F. App'x at 295). The inquiry is whether the harm to the victim would have occurred in the absence of the defendant's conduct. *Schenck*, 2023 WL 3019959, at *6; *In re Fisher*, 640 F.3d 645, 648 (5th Cir. 2011) (a person is directly harmed when the offense is the but for cause of that harm, and she is proximately harmed when the harm is a reasonably foreseeable consequence of the criminal conduct). Where the MVRA's causation standard is satisfied, "a district court must include the amount of that loss in its restitution order." *Eyraud*, 809 F.3d at 467.

Here, the victims of Perkins' admitted crimes include deceased victim Dunmire, his family member R.S., and the funeral home that provided some services for M.D.'s funeral. Perkins' murder of Dunmire not only directly and proximately caused loss and harm to him, but also to R.S. and the funeral home, which covered some costs of M.D.'s cremation and funeral. Accordingly, each of them meets the statutory definition of "victim" under the MVRA.

C.       THE REQUESTED RESTITUTION CATEGORIES ARE PERMITTED
         UNDER 18 U.S.C. § 3663

The Government seeks restitution in three categories: (1) lost income; (2) funeral expenses; and (3) expenses incurred by the estate's representatives for participating in this proceeding. 18 U.S.C. § 3663A authorizes restitution for each of these categories.

1.       Lost Income

In an offense resulting in bodily injury to a victim, the Court shall order that the defendant "reimburse the victim for income lost by such victim as a result of such offense." 18

22

U.S.C. § 3663A(b)(2)(C).  This restitution for lost income includes lost future income that a victim would have earned but-for the at-issue criminal conduct.  *See, e.g.*, *United States v. Messina*, 806 F.3d 55, 69 (2d Cir. 2015); *United States v. Serawop*, 505 F.3d 1112, 1118-21 (10th Cir. 2007).

Here (and in all cases involving lost future income), the government's loss calculation for D.M.'s future income is necessarily extrapolated due to Defendant's murder of the victim.  *E.g.*, *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 546 (1983) ("[B]y its very nature the calculation of an award for lost earnings must be a rough approximation. . . . . [T]he lost stream [of income] can never be predicted with complete confidence.").  "While calculations of future lost income must be based upon certain economic assumptions, the concepts and analysis involved are well-developed in federal law, and thus the district court is not without persuasive analogy for guidance."  *United States v. Cienfuegos*, 462 F.3d 1160, 1169 (9th Cir. 2006).

In determining future lost income, the first step is to decide the length of time that income would be obtained.  *See Pfeifer*, 462 U.S. at 533.  For wages, this is usually determined by the age in which the person would likely retire.  The next step is determining the after-tax wages and other fringe benefits.  *See id.* at 534.  Often the analysis starts with the person's wages at the time, but the analysis can include the increase in wages that likely will occur over time.  *See id.* at 535.  After adding the wages and other income over applicable periods of time, the total amount is then discounted by a reasonable rate.  *See id.* at 537.

The following table includes the Government's calculation regarding the loss to the deceased victim's estate for future wages and income.  His earnings at the time of death forms the basis for his projected future earnings.  The Government conservatively projects that any future salary increases would have been cost-of-living adjustments to account for inflation.  Accordingly, promotion potential and performance-based enhancements are not included.  The

23

total earnings figure accounts for how long the victim would have reasonably expected to continue working.  Future income included within that projection is then discounted to present value using the 20-year maturity treasury yield as of March 5, 2021, the last business day prior to the victim's death, because "[t]he discount rate should be based on the rate of interest that would be earned on 'the best and safest investments.'" *Pfeifer*, 462 U.S. at 537.[7]  Income that the victim would have earned but for the criminal conduct is neither discounted nor subject to pre-judgment interest.

Here, Dunmire's hourly wage rate at the time of his death in 2021 was $15.00.  *See* (Ex. 27: Letter from employer M.A.).  He typically worked full time (40 hours a week).  *Id.* Assuming 50 working weeks annually, M.D.'s gross salary was $30,000.  His annual post-tax salary, then, was approximately $28,300.[8]

### Calculation of Lost Income Restitution

| | |
|---|---|
| 2021 Wage Rate (Post-Tax) | $28,300 post-tax |
| Victim's Age at Death | 31 |
| Additional Years Expected to Work | 25[9] |
| Total Loss over Future Working Years | $707,500.00 |
| Discount Rate[10] | 2.18% |
| Present Value of Lost Income | $596,307.13 |

The assumptions included above yield a net present value of the deceased victim's lost income of $596,307.13. These assumptions are reasonable, grounded in fact, and meet the

---

[7] See https://home.treasury.gov/resource-center/data-chart-center/interest-rates/TextView?type=daily_treasury_long_term_rate&field_tdr_date_value=2021.

[8] Marginal tax rates and after-tax income calculated using https://www.forbes.com/advisor/income-tax-calculator/ohio/?deductions=0&filing=single&income=30000&ira=0&k401=0&opt=on (single filer, taking standard deduction, living in Ohio and claiming no dependents).

[9] *See* Table 4, Krueger & Slesnick, *Total Worklife Expectancy*, 25 J. Forensic Econ. 1. P. 51-70 (2014) (a 30-year-old man with a high school diploma currently in the labor force would be expected to work approximately 29.32 remaining years).

[10] Discount rate is applied for lost income in 2026 and later, to account for the net present value of lost income as of sentencing.  The Government does not apply any pre-judgment interest to the lost income from 2021–2025.

requirements of *Pfeifer* and other cases requiring a demonstration of lost income according to a reasonable set of assumptions. *See, e.g.*, *United States v. Johnson*, 125 F.4th 1352, 1360 (10th Cir. 2025) (upholding lost income amounts premised on deceased victim's wife's testimony); *United States v. Saipov*, 2024 U.S. Dist. LEXIS 10891 at *11-12 (S.D.N.Y. Jan. 22, 2024) (relying on an injured victim's declaration to support restitution for anticipated lost income figures); *United States v. Starr*, 731 F.Supp.3d 1272, 1276 (M.D. Ala. 2024) ("For a death involving a healthy, single, working-age adult of limited means who was employed . . . at the time of her death, it is entirely reasonable to assume that she would have worked [in the same position] until she reached retirement age.").

Specifically, the assumptions are reasonable because of their conservative nature. For example, the Government assumes that the victim's wage rate would not have been subject to any increase for promotion or performance-related bonuses. Likewise, the Government assumes an early retirement after 25 more years of employment; by contrast, published data concerning remaining work life expectancy would suggest retirement after 28 more years of employment.[11] The Government's calculated lifetime-earning potential, premised on a flat wage rate and early retirement, is therefore reasonable and sound. $596,307.13 should be ordered payable to the deceased victim's estate pursuant to 18 U.S.C. § 3663A(b)(2)(C).

2.    Funeral Expenses

18 U.S.C. § 3663A(b)(3) provides that "an amount equal to the cost of necessary funeral and related services" is available where, as here, the injury "results in the death of a victim."

---

[11] *See* Table 4, Krueger & Slesnick, *Total Worklife Expectancy*, 25 J. Forensic Econ. 1. P. 51-70 (2014). If M.D. had worked until his minimum age to attain Social Security retirement benefits, that would have been 31 more years of employment.

The victim's family and the funeral home that provided services have provided information concerning the necessary funeral expenses.  (*See* PSR at ¶¶ 23, 97).  Those costs and expenses are set forth below.

| Funeral Expenses | Amount |
|---|---|
| Cremation (payable to R.S.) | $958.00 |
| Funeral Services (payable to Claytor Rollins Funeral Home) | $930.50 |
| **TOTAL** | **$1,888.50** |

Each of these costs are reasonably foreseeable funeral-related expenses.  The family had the victim's body cremated, and the funeral home provided space for a celebration of life service.  It is reasonable and foreseeable that a victim's murder would result in necessary funeral expenses.  The victim's family paid the $958.00 cremation costs.  The funeral home provided the celebration of life services without charging the victim's family, in light of the circumstances present here.  The $930.50 costs sought are state-mandated costs of those services and are therefore reasonable estimates of the value of the services provided.  All documentation and proof of the above expenses were provided to the pretrial services officer and were incorporated into the presentence report investigation.  The court should order $1,888.50 as restitution for funeral expenses pursuant to 18 U.S.C. § 3663A(b)(2).

### 3. Costs of Attendance

18 U.S.C. § 3663A(b)(4) provides that "in any case" subject to the MVRA, restitution is required to reimburse the victim for "transportation, and other expenses incurred during . . . attendance at proceedings related to the offense."

Here, the victim's family representatives are expected to incur travel expenses for their attendance and participation in the sentencing hearing.  The family members live a great distance from the Courthouse and are required to travel by air to be present.  The government has requested that the representatives provide documentation of their costs for currently booked

26

travel and hotels. The government will provide these cost figures and documentation when received from the family representatives.  These costs are available, and should be awarded, to the victim's family representatives pursuant to § 3663A(b)(4).

## III.    CONCLUSION

Based on the foregoing, the Government respectfully requests this Court impose a sentence at the high end of the agreed-upon range.  A sentence of 300 months is sufficient, but not greater than necessary, to account for the seriousness of Perkins' actions and the nature and circumstances of that offense, to promote respect for the law, and to provide just punishment for the offense.

Respectfully submitted,

DAVID M. TOEPFER
United States Attorney

By:    /s/ Scott Zarzycki
       Scott Zarzycki (OH: 0072609)
       Assistant United States Attorneys
       United States Court House
       801 West Superior Avenue, Suite 400
       Cleveland, OH 44113
       (216) 622-3971/3709
       (216) 522-8355 (facsimile)
       Scott.Zarzycki@usdoj.gov